IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

NOV 6 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Respondent,<br><br>v.<br><br>ROY EDWARD CANTU,<br>Petitioner. | §<br>§<br>§<br>§<br>§<br>§<br>§ | CR. NO. B-98-75<br>(Civil Action No. B-03-147) |

## UNITED STATES' ANSWER TO MOTION TO VACATE UNDER 28 U.S.C. § 2255 AND BRIEF

The United States of America, by the United States Attorney for the Southern District of Texas, files this Answer to Motion to Vacate under 28 U.S.C. § 2255 and Brief.

### JURISDICTION

This court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. § 2255.

### DENIAL

The United States denies each and every allegation of fact made by Petitioner, Roy Edward Cantu ("Cantu"), except those supported by the record and those specifically admitted herein, and demands strict proof thereof.

### ALLEGATION

Cantu makes the following allegations in support of his motion to vacate

sentence:

1.    The statute of limitations for filing his Motion to Vacate should be tolled for the time in which he erroneously believed a petition for writ of certiorari was pending.

2.    He was denied his right to effective assistance of counsel because his attorney failed to move for a judgment of acquittal on the conspiracy count based on his acquittal on the substantive count.

3.    He was denied his right to effective assistance of counsel because his attorney failed to move to dismiss count two due to alleged multiplicity in the indictment.

4.    He was denied his right to effective assistance of counsel when his attorney failed to file a petition for writ of certiorari on his behalf.

## ANSWER AND BRIEF

### Statement of the Case

Roy Cantu was indicted on February 11, 1998, in the United States District Court for the Southern District of Texas, Brownsville Division, Criminal No. B-98-75, for the substantive offense of RICO and for RICO conspiracy in violation of 18 U.S.C. §§ 1962(c) and (d) (Doc.[1] 1). A jury acquitted him on the substantive count and convicted him on the conspiracy count (Doc. 71). This court sentenced him to 224 months confinement, to a five-year term of supervised release and assessed a $50 special assessment (Doc. 83). Cantu appealed his conviction and it was affirmed in

---

[1] "Doc." refers to the document filed in the underlying criminal case, B-98-75, and is followed by the document number.

a published decision. *United States v. Cantu*, 185 F.3d 298 (5th Cir. 1999). The mandate of affirmance issued on September 2, 1999 (Doc. 99). Cantu waited almost four years, until August 18, 2003, to file his Motion to Vacate (Doc. 100).

B.    Statement of the Facts

Fabion Cavazos (Cavazos) began working for Javier Cantu trafficking in marihuana in the mid-1980's (Doc. 90, p. 60). In the beginning, he and Javier Cantu dealt in small quantities of 10 to 20 pounds, but the amounts eventually grew larger (Doc. 90, pp. 168-69). Cavazos and Javier Cantu drove the marihuana to customers in Arkansas, including Terry Crump and Bill Marsh (Doc. 90, pp. 167-68, G.E. 86, 87).

Roy Cantu was Javier Cantu's older brother (Doc. 90, pp. 89-90). In January 1986, Javier Cantu, Roy Cantu and others attempted to send marihuana out of the Rio Grande Valley area from the Harlingen airport (Doc. 90, pp. 89-90, 98, 161-63). Roy Cantu and others were arrested and 40 pounds of marihuana was seized; but Javier Cantu escaped (Doc. 90, pp. 98, 161-63; Doc. 91, pp. 364-371, 375-380, 386-92; Doc. 92, p. 628-29; G.E. 148).

In December of 1987, Bill Marsh was arrested in Carthage, Texas, near the Louisiana border with 10 pounds of marihuana in his car (Doc. 91, pp. 290-95). During the same month Javier Cantu and Cavazos were on their way from Houston

to Arkansas when they were arrested in Carthage, Texas, driving a vehicle that had 13 pounds of marihuana concealed in the door panels (Doc. 90, pp. 169-170; Doc. 91, pp. 296-302; Doc. 92, pp. 628-29; G.E. 148).

Cavazos and Javier Cantu also supplied marihuana to Russell Blackwell (Doc. 90, p. 166). In December 1986, Cavazos was arrested with Blackwell in Louisiana with 23 to 25 pounds of marihuana that had been supplied by Javier Cantu (Doc. 90, pp. 163-66; Doc. 91, pp. 274-89; Doc. 92, pp. 628-29; G.E. 148). They were going from Houston to New Orleans and Cavazos was supposed to return with money (Doc. 90, pp. 164-165). Cavazos transported money for Javier Cantu on many occasions (Doc. 90, pp. 194-95). Gary Cantu also moved money for the organization (Doc. 90, pp. 234). Gary Cantu was Roy and Javier Cantu's cousin (Doc. 90, p. 233).

Roy Cantu was married to Graciela Cantu (Doc. 90, pp. 89-92, 145, 160). Roy Cantu worked for Javier Cantu and eventually participated in the deliveries of marihuana to customers in Arkansas (Doc. 90, pp. 145, 160, 169). Gracie went with him on three occasions to Hot Springs, Arkansas where Roy Cantu introduced her to Bill Marsh and Terry Crump (Doc. 90, pp. 92-96; G.E. 86, 87). Gracie Cantu also saw Marsh several times in the Rio Grande Valley area (Doc. 90, p. 97).

While the marihuana was in Brownsville, Cavazos, and later Roy and Gary Cantu, weighed the marihuana and packaged it with Saran wrap (Doc. 90, pp. 172,

175-76). The marihuana was wrapped in 50 pound packages (Doc. 90, pp. 248-49). Saran wrap was used to control the odor of the marihuana as it was taken through the Sarita checkpoint south of Corpus Christi (Doc. 90, pp. 173-74).

By 1990, the organization was receiving in Brownsville 1000-pound loads of marihuana once or twice each month and shipping it out in 200 or 300 pound quantities (Doc. 90, pp. 176-77, 179). At that time Roy Cantu, Gary Cantu and Baldomero Duran ("BJ") were participating in the organization (Doc. 90, pp. 176-77; Doc. 91, pp. 430). The organization used the United Parcel Service (UPS) and other methods, including Russell Blackwell, to transport the marihuana (Doc. 90, pp. 177-78). Sometimes the marihuana was taken to the UPS warehouse in Harlingen and then driven in large trucks through the checkpoint (Doc. 90, pp. 238-40; G.E. 7). After the marihuana passed the checkpoint, Cavazos and Roy Cantu would hide it at stash houses (Doc. 90, pp. 181-82).

Javier Cantu's marihuana was sometimes taken to Houston and stored at a mobile home located on Miller Road and occupied by Rudy Garza (Doc. 90, pp. 206-208; G.E. 94). The marihuana was stored there until it was transported to a house on Manitou Road in Houston for delivery to customers (Doc. 90, pp. 99-102, 208; G.E. 18). Javier Cantu controlled both properties and had purchased or leased them from Guadalupe Pena (Doc. 91, pp. 332-36, 341-43, 345, 354-59; G.E. 18, 88). He paid for

the properties with marihuana and with cash (Doc. 91, pp. 344-48, 356-57). Sometimes members of Javier Cantu's organization, including Roy Cantu, used a car shop owned by Pena to load large quantities of drug proceeds, ranging from $30,000 to $50,000, into tires (Doc. 91, pp. 343, 349-51, 439-40).

In January, 1991, Cavazos and Roy Cantu were arrested while transporting 151 pounds of marihuana from Ross Jenkins' house in Houston (Doc. 90, pp. 183-85, 188-90; Doc. 91, pp. 312-331; Doc. 92, pp. 628-29; G.E. 89, 105, 148). The marihuana had been taken through the checkpoint by Rosie Cantu's boyfriend, Joe Quintero, who worked for UPS (Doc. 90, pp. 186-87). Rosie Cantu was Roy and Javier Cantu's sister (Doc. 90, p. 159). Ross Jenkins brought the marihuana from the checkpoint to Houston (Doc. 90, pp. 187-90; G.E. 89, 105). At the time of Cavazos and Roy Cantu's arrest, the car also contained $47,000 in drug proceeds that belonged to Javier Cantu, which was supposed to be returned to Brownsville (Doc. 90, pp. 188, 193-94; Doc. 91, pp. 312-331). Javier Cantu was present during the transaction and was last seen that day at Hobby Airport in Houston (Doc. 90, p. 185; Doc. 91, pp. 317-19).

Javier Cantu hired attorneys to represent Cavazos and Roy Cantu and Ed Cyganiewicz represented Roy Cantu (Doc. 90, p. 210; Doc. 92, p. 630). Both Cavazos and Roy Cantu were convicted; Roy Cantu went to prison for a year and 8 months

(Doc. 90, pp. 148, 196; Doc. 92, pp. 609-610; G.E. 140). During that time, his wife Graciela received money from Javier Cantu (Doc. 90, p. 114). At first she received cash, then she received monthly checks of $2,008.75 from her sister, Sylvia Rosenbaum, and John Wester that were drawn on the account of the Island Hotel (Doc. 90, pp. 102-103, 108-114; Doc. 91, pp. 394-96, 402-04; G.E. 3, 31, 135). Javier Cantu owned the Island Hotel (Doc. 90, pp. 234-35; Doc. 91, pp. 403-04; Doc. 92, pp. 608-609; G.E. 3, 34). Graciela Cantu never worked at the Island Hotel or anywhere else for the money she received (Doc. 90, pp. 114-116).

John Wester was an attorney who went into business with Javier Cantu around 1992 and who was having a romantic relationship with Sylvia Rosenbaum (Doc. 90, p. 103, Doc. 91, p. 402). Javier Cantu and Wester operated a restaurant called Pesos Restaurant (Doc. 90, p. 116-18; G.E. 111). Some of the purchase money for that restaurant and for the Island Hotel, $75,000 in currency, was delivered to John Wester by Roy Cantu after he picked it up at Javier Cantu's residence (Doc. 90, p. 103-108, 149). In 1993, Sylvia Rosenbaum paid contractors $150,000 in cash for improvements on the restaurant; the cash was paid in weekly installments (Doc. 92, p. 624-28).

Javier Cantu's organization distributed marihuana to Antonio Sepulveda (Doc. 90, pp. 230-31). Sepulveda began working for Javier Cantu in 1992 after Sepulveda

was arrested for possessing cocaine (Doc. 91, pp. 415-16). Sepulveda's responsibilities included weighing, packaging, storing and loading marihuana on to tractor-trailers for Javier Cantu (Doc. 91, pp. 417-18).

Cavazos and Roy Cantu were released from jail at the same time (Doc. 90, pp. 195). After their release, they continued marihuana trafficking (Doc. 90, pp. 195-96). The loads were taken to Houston on the average of two times per month and Javier Cantu paid Roy Cantu and Cavazos an average of $5,000 to $7,000 for each load (Doc. 90, pp. 208-209, 263). The payment was for packaging the marihuana, following the truck to Houston, unloading the marihuana at Miller Road and waiting for the customer to pick it up (Doc. 90, pp. 209).

Marihuana was packaged and stored by Sepulveda, Joe Garza, Gary Cantu, Roy Cantu, Baldomero Duran and Javier Cantu at the home of Esperanza Vasquez at 124 Camino Del Rey in Brownsville (Doc. 90, pp. 197-200, 233-34; Doc. 91, pp. 427-31; G.E. 16). The marihuana was from Mexico and Roy Cantu and Cavazos would drive the loads of marihuana to the Camino Del Rey location from places like a Brownsville business called Straight Shot (Doc. 90, pp. 199-200; Doc. 91, pp. 429, 433-34). Beginning in 1994, Sepulveda helped with loads of between 500 and 1000 pounds on approximately ten occasions and Javier Cantu paid him and the others (Doc. 91, pp. 429-31). Records were kept of the marihuana as it was weighed and

packaged and were turned over to Javier Cantu (Doc. 91, pp. 432-33).

During the operation, both Roy Cantu and Cavazos received and passed on instructions that they received from Javier Cantu; they were the same level in the organization (Doc. 90, pp. 262-63; Doc. 91, pp. 441, 467-68). Sepulveda considered both Roy Cantu and Cavazos as holding the same high rank in the organization (Doc. 91, p. 441).

Between 1993 and 1995, many loads ranging in size from 100 to 1000 pounds were unloaded and packaged at the Camino Del Rey location (Doc. 90, p. 201). From there the marihuana was taken about 20 to 30 miles to the UPS facility in Harlingen where it was loaded on to a UPS trailer (Doc. 90, p. 202; Doc. 91, pp. 434-36; G.E. 7). Roy Cantu, Cavazos and Gary Cantu participated in taking the loads to that facility from the Camino Del Rey location (Doc. 91, pp. 434-35). From there it would go through the checkpoint and then it was taken to Houston in Ross's tractor-trailer (Doc. 90, p. 203). The loads were taken to Houston in 300 to 400 pound quantities about twice per month (Doc. 90, p. 208). Once in Houston, the marihuana was taken at first to the Manitou house and later to the trailer on Miller Road (Doc. 90, pp. 203-205; G.E. 18, 88). Until the drugs were distributed they were stored at Miller Road where Rudy Garza was living (Doc. 90, pp. 206-207; Doc. 91, pp. 438-39; G.E. 94). From Manitou the marihuana was picked up by customers like Bill or Terry (Doc. 90,

pp. 204-205). Sepulveda sold loads of 250 to 300 pounds from that location on approximately three occasions (Doc. 91, pp. 436-37; G.E. 18). Sepulveda also delivered money to Javier Cantu at the Manitou location on three occasions (Doc. 91, p. 438). On one occasion he delivered $150,000 (Doc. 91, p. 438).

Javier Cantu purchased two condominiums from Sepulveda and paid for them with marihuana (Doc. 90, p. 228-30; Doc. 91, pp. 418-19; G.E. 4). On three or four occasions Sepulveda used one of the condominiums to weigh, package and store marihuana and was paid between $2500 and $3000 (Doc. 91, pp. 419-21). Cavazos counted thousands of dollars in drug proceeds at one of those condominiums on many occasions (Doc. 90, pp. 231-33). The other condominium was used by Roy and Gary Cantu (Doc. 90, p. 233).

Javier Cantu also used the UPS facility in Brownsville to ship marihuana out of the Rio Grande Valley (Doc. 91, pp. 421-22; G.E. 22). The marihuana would be loaded on to the UPS trailers at 2:00 or 3:00 in the morning (Doc. 91, p. 423). On two occasions Sepulveda helped load the trailers at the Brownsville facility with about 800 pounds of marihuana and Javier Cantu paid him around $500 for each load (Doc. 91, pp. 423-25). On one occasion, Javier Cantu told Sepulveda about a load of his marihuana being seized at the UPS facility in Brownsville (Doc. 91, pp. 425-26). Javier Cantu told Sepulveda that a maintenance worker heard people loading the

marihuana and discovered it. Javier Cantu then alerted the driver, who was en route to the UPS facility (Doc. 91, pp. 426-27).

In April, 1993, 645 pounds of marihuana was seized from the back of a UPS trailer at a UPS warehouse in Brownsville, Texas (Doc. 91, pp. 472-77, 480; Doc. 92, pp. 628-29; G.E. 148). Police responded to a report and inspected the trailer at 2:45 a.m. to confirm that it contained boxes of marihuana (Doc. 91, p. 474). They left the boxes intact and set up surveillance to see who would pick up the load (Doc. 91, p. 477). A driver arrived at 6:00 a.m. and acted as if he was inspecting the trailer (Doc. 91, pp. 427, 477). The driver opened the trailer door and went to UPS security and told them about the marihuana in the trailer (Doc. 91, pp. 427, 478-79). The officer who had originally inspected the boxes of marihuana was watching and formed the opinion that the driver was feigning surprise (Doc. 91, p. 478-79).

In March of 1993, Roy and Javier Cantu's sister, Rosario Cantu, was stopped in Refugio County, Texas, while driving a vehicle with insurance in the name and address of Esperanza Vasquez, 124 Camino Del Rey, Brownsville (Doc. 90, p. 159; Doc. 91, pp. 482-85). At the time of the stop she was in possession of $12,500 in currency that was concealed inside a food carton (Doc. 91, pp. 488-89; G.E. 118). Further investigation revealed that the vehicle identification number of the vehicle she was driving had been tampered with and that the vehicle had been stolen from

Arkansas (Doc. 91, pp. 485-89).

During December 1994, Javier Cantu stored marihuana at Graciela Cantu's house on Young Street in Brownsville, Texas (Doc. 90, pp. 118-120, 123, 235-36; Doc. 92, pp. 614-616; G.E. 9). The house had been built with cash supplied by Javier Cantu (Doc. 92, pp. 613-616; G.E. 9). The marihuana was packaged at that location on three occasions by Cavazos, Roy Cantu, Javier Cantu and Gary Cantu (Doc. 90, pp. 120-122).

In October, 1994, Terry Crump was arrested in northeast Texas with 40 pounds of marihuana (Doc. 91, pp. 303-310). The marihuana was concealed in a dog kennel located in the back of his vehicle and it had been loaded at the Manitou house by Cavazos and Roy Cantu for Javier Cantu (Doc. 90, pp. 211-13; Doc. 91, pp. 308-310; G.E. 87).

Mark Miller (Miller) was from Indiana and picked up loads of marihuana in Houston for Jerry Lamar and drove them back to Indiana (Doc. 90, p. 213; Doc. 91, pp. 496-99; G.E. 95). Miller picked up four loads of marihuana in Houston between 1992 and 1993 (Doc. 90, pp. 214; Doc. 91, pp. 499-501). In March, 1993, he was stopped in Sulphur Springs, Texas, and found to be in possession of a small amount of marihuana (Doc. 91, pp. 500-501). After his arrest, Miller stopped transporting marihuana until 1994 (Doc. 91, p. 501).

In 1994, Miller went to Houston and received 30 pounds of marihuana from Rudy Garza at a McDonald's restaurant (Doc. 91, p. 502; G.E. 94). In late June 1994, he agreed to pick up marihuana at Javier Cantu's Manitou house (Doc. 91, pp. 502-504; G.E. 18). After Miller arrived, Rudy Garza left to pick up the marihuana from a different location (Doc. 91, p. 504). Miller then took the load of marihuana to Indiana (Doc. 91, p. 504).

Miller made other trips to the Manitou address to get marihuana in August 1994 and October 1994 (Doc. 90, pp. 213-14; Doc. 91, pp. 505-506). In October, Javier Cantu was at the residence when Miller arrived, but he introduced himself to Miller as Fabian (Doc. 91, pp. 506-507). Miller made another trip in November and at that time Roy Cantu was there along with Rudy Garza and Cavazos (Doc. 91, pp. 507-10). While picking up that load, Miller received a package of marihuana which he delivered to Terry Crump in Hot Springs, Arkansas before returning to Indiana (Doc. 91, pp. 508-12; G.E. 87).

Miller went to the Manitou location again in January 1995 (Doc. 91, p. 512). On his return trip he took 30 pounds of marihuana to Indiana and a larger package of marihuana to Terry Crump in Arkansas (Doc. 91, pp. 512-13). In March, 1995, Miller returned to the Manitou address again (Doc. 91, p. 513). This time Javier Cantu and Roy Cantu were present (Doc. 91, p. 513). Lamar handed Javier Cantu a stack of

money that Miller understood was drug proceeds and Javier Cantu and Roy Cantu counted it (Doc. 91, pp. 518-19). On his return trip, Miller took marihuana to Terry Crump in Arkansas and to Indiana (Doc. 91, p. 513-14). In April 1995, Miller returned to the Manitou house to pick up another load of marihuana (Doc. 90, pp. 214-15; Doc. 91, p. 514). Javier Cantu, Cavazos and Roy Cantu were there when he arrived (Doc. 90, p. 215; Doc. 91, pp. 514-15). Miller was planning on taking marihuana to Arkansas and to Indiana and Javier Cantu asked him if he would also be willing to take some marihuana to Milwaukee, Wisconsin (Doc. 91, pp. 515-16). Miller agreed and received over 100 pounds of marihuana (Doc. 91, pp. 516-17). The marihuana was brought to the Manitou house by Rudy Garza (Doc. 90, pp. 215).

While driving through Shelby County, Texas, Miller was stopped by a law enforcement officer on April 25, 1995, for a traffic violation (Doc. 91, pp. 519, 531-33). His vehicle was searched and 194 pounds of marihuana was discovered (Doc. 91, pp. 534-35, 548; Doc. 92, pp. 628-29; G.E. 28, 148). Miller decided to cooperate and told law enforcement officers the source of the marihuana (Doc. 91, p. 519). The officers then devised a plan to disable Miller's vehicle and to have him call for someone to pick him up (Doc. 91, p. 535). They used a public telephone located in Teneha, Texas (Doc. 91, pp. 519-20, 535-36, 538).

At approximately 8:30 p.m. Miller called a number he had been provided for

-14-

the Houston area and someone answered: "Rudy's Place" (Doc. 91, pp. 520, 543, 550). He then called a second number and said that his vehicle had broken down and was told that someone would help him (Doc. 90, p. 215; Doc. 91, pp. 520, 544). Javier Cantu then called Cavazos and instructed him and Roy Cantu to help Miller (Doc. 90, pp. 218-19).

Telephone records from April 25, 1995, showed that on that day a call was made from a telephone at the Manitou house to Milwaukee (Doc. 91, pp. 565-66, 576, 579; G.E. 77). Records also showed that at 4:54 p.m. a call was made from the Manitou house to a telephone subscribed to by Terry Crump in Arkansas (Doc. 91, p. 580). At 8:33 p.m. a call was made from Rudy Garza's cellular telephone to Javier Cantu's pager (Doc. 91, pp. 566-67, 580-82; G.E. 72, 91, 123, 131). At 8:40 p.m. a call was returned to that telephone from a telephone that Javier Cantu had in the name of Gloria Villacana (Doc. 91, pp. 567-72, 582-83; G.E. 82). At 8:41 p.m. a call was made from the Manitou house to a pay telephone in Tenaha, Texas (Doc. 91, pp. 539, 583).

After the calls, Cavazos and Roy Cantu arrived at Miller's location in two vehicles (Doc. 90, p. 220; Doc. 91, pp. 521, 537). Cavazos was driving an Explorer that was registered in Javier Cantu's name (Doc. 91, pp. 522-24, 55051; G.E. 28, 35). The police watched as Roy Cantu and Cavazos loaded the marihuana into one of the

two vehicles; then they arrested the two men (Doc. 90, pp. 220-222; Doc. 91, pp. 521-22, 537-40). Rudy Garza's cellular telephone was found inside the Explorer (Doc. 91, pp. 548-50, 567; G.E. 123).

After the arrests Javier Cantu provided part of the $7000 that Graciela Cantu put up for Roy Cantu's bond (Doc. 90, pp. 124-30;G.E. 39). Javier Cantu hired Bill Portis to represent Cavazos, who was sentenced to 48 months and was still serving his sentence when he testified at Roy Cantu's trial (Doc. 90, pp. 223-25; Doc. 92, pp. 630-31; G.E. 44). Javier Cantu again hired Ed Cyganiewicz to represent Roy Cantu (Doc. 92, p. 630). Roy Cantu plead guilty to conspiracy to distribute marihuana and was also sentenced to 48 months confinement (Doc. 91, pp. 552-54; G.E. 141).

At trial, Graciela Cantu testified that calls to her number from Javier Cantu, Sepulveda, Rudy Garza, Gary Cantu and Terry Crump were typically for Roy Cantu (Doc. 90, pp. 136-38). Records showed that during the period between May 1994 and April 1995, 155 calls to Graciela Cantu's numbers from numbers associated with Javier Cantu and 71 calls from Graciela's telephones to telephones associated with Javier Cantu were made; 67 calls from numbers connected to Cavazos to numbers connected to Graciela Cantu were made; several calls between Graciela Cantu's numbers and numbers associated with Sepulveda and Rudy Garza were made; 338

calls were made back and forth from numbers associated with Graciela Cantu and the Manitou address; and, two calls between numbers associated with Graciela Cantu and Terry Crump were made (Doc. 90, pp. 130-35, 240-44; Doc. 91, pp. 408-411, 442, 493-95, 564-566, 567-72, 574-577; G.E. 72, 73, 75, 76, 77, 81, 82, 91, 131, 142, 143, 146).

### Tolling the Statute of Limitations

"Title 28 U.S.C. § 2255 provides that a one year period of limitations is applicable to § 2255 motions." *United States v. Thomas*, 203 F.3d 350, 351 (5th Cir. 2000). "That one year limitation typically begins to run 'on the date on which the judgment of conviction becomes final.'" *Id.* (citing 28 U.S.C. § 2255(1), footnote omitted). If defendant does not file a petition for writ of certiorari, his conviction becomes final when the ninety-day period for seeking certiorari review expires. *United States v. Gamble*, 208 F.3d 536, 537 (5th Cir. 2000). Since Cantu did not file his petition until August 18, 2003 (Doc. 100), almost four years after the mandate issued on September 2, 1999 (Doc. 99), his motion was untimely.

Cantu alleges, however, his attorney told him he would file a petition for writ of certiorari on his behalf (Doc. 100, Appendix D). Citing 28 U.S.C. § 2255(4), he argues the statute of limitations period should start from the date he discovered that his attorney did not perfect a writ of certiorari (Doc. 100, pp. 12-13). Section 2255,

¶ 6 provides that the one-year limitation period run from the latest of

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution of the laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255¶ 6.

Cantu argues that subsection (4) of § 2255 ¶ 6 applies in his case to toll the statute of limitations. However, the facts that he alleges apply to just one of the three claims that he makes in support of his motion to vacate, that is, his claim that he was denied his right to effective assistance of counsel when his attorney failed to file a petition for writ of certiorari on his behalf. Also, these facts, even if true, are insufficient to state any claim that would entitle him to relief under 28 U.S.C. § 2255.

The constitutional right of indigent defendants pursuing appeals as of right to have a brief filed on their behalf by an attorney does not extend to forums for discretionary review. *Austin v. United States*, 513 U.S. 5, 8, 115 S.Ct. 380, 381 (1994)

(citations omitted). "[T]he Supreme Court has not extended the right to counsel to discretionary review." *Clark v. Johnson*, 227 F.3d 273, 283 (5th Cir. 2000); *see also United States v. Palomo*, 80 F.3d 138, 142 (5th Cir. 1996) ("[W]hile the Constitution requires appointment of counsel for direct appeals as of right, neither due process nor equal protection mandates the appointment of counsel in state discretionary appeals.") (citing *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437 (1974)); *Jackson v. Johnson*, 217 F.3d 360, 365 (5th Cir. 2000) ("a criminal defendant has no constitutional right to counsel on matters related to filing a motion for rehearing following the disposition of his case on direct appeal."). If a criminal defendant has no constitutional right to counsel to pursue applications for review in the Supreme Court, he or she cannot be deprived of the effective assistance of counsel by counsel's failure to timely pursue such an application. *Wainwright v. Torna*, 455 U.S. 586, 587, 102 S.Ct. 1300, 1301 (1982).

As the court explained in *United States v. Eisenhardt*, 10 F.Supp.2d 521, 522 (D.Ct. Md 1998):

> The Supreme Court has flatly held that no ineffective assistance claim under the Sixth Amendment is made out by a contention that counsel, retained or appointed, failed to pursue discretionary relief in the Supreme Court. *Wainwright v. Torna*, 455 U.S. 586, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982); *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). In that the Supreme Court's review of federal criminal cases by *certiorari* is a discretionary review, *see Miller v.*

> *Keeney*, 882 F.2d 1428, 1432 n. 6 (9th Cir. 1989), there is simply no right
> to have the advice of counsel in pursuing it. *Id.* (This does not, of
> course, take into account the duties of counsel *appointed* for indigents
> pursuant to the Criminal Justice Act, who do have a duty under that Act
> and its implementing plan with regard to *certiorari* review, *see Proffitt
> v. United States*, 549 F.2d 910 (4th Cir. 1976), *cert. denied*, 429 U.S.
> 1076, 97 S.Ct. 818, 50 L.Ed.2d 795 (1977), but no such duty existed
> here on the part of *retained* counsel).

Because there is no constitutional right to effective assistance of counsel for the

purpose of pursuing discretionary certiorari review in the Supreme Court, Cantu

cannot establish that he falls under any exception to the one year statute of limitation

set forth in 28 U.S.C. § 2255, ¶ 6.

Assuming *arguendo*, that this court must reach the question of whether the

statute of limitations was tolled as to Cantu's claim that he was denied his right to

effective assistance of counsel in the pursuit of a writ of certiorari, the appropriate

inquiry is whether "a duly diligent person in petitioner's circumstances would have

discovered that no [petition for writ of certiorari] . . . had been filed." *See Wims v.

United States*, 225 F.3d 186, 189 (2d Cir. 2000) (discussing issue in terms of

petitioner's failure to discover his attorney had failed to pursue a direct appeal).

Under this standard, Cantu's allegations, if true, are insufficient to support a finding

of due diligence. According to Cantu, he was told by his attorney in October 1999

that a petition for writ of certiorari would be filed on his behalf (Doc. 100; Appendix

D). He stated that he contacted his attorney's office on numerous occasions in the three years that followed, but makes no allegation of any additional assurance that the petition had been filed. *Id*. He alleges that he made no attempt to contact the Supreme Court directly until June 1, 2003. *Id*. These facts are insufficient to support a finding of due diligence. They are also insufficient to support a finding of equitable tolling, as Cantu makes no factual allegation that would support a finding of intentional deceit on the part of his attorney. *See United States v. Riggs*, 314 F.3d 796, 799-800 (5th Cir. 2002) (mere attorney error or neglect is not an extraordinary circumstance such that equitable tolling is justified), *cert. denied*, 123 S.Ct. 2630, 156 L.Ed.2d 645 (2003).

If, however, such allegations were sufficient to delay the start of the one-year limitations period or to equitably toll the statute of limitations as to that claim only, Cantu's claim is clearly insufficient to warrant any relief. As discussed above, because he had no right to effective assistance of counsel in relation to a petition for writ of certiorari, he has failed to allege any constitutional violation. This court should therefore dismiss all of the claims presented by Cantu in his motion under 28 U.S.C. § 2255 as out of time; or, in the alternative, find only his claim that he was denied effective assistance of counsel in relation to his writ of certiorari as timely, but without merit.

Alleged Ineffective Assistance of Counsel - Double Jeopardy and Multiplicity

Assuming *arguendo* Cantu's remaining claims, that is, that he was denied his right to counsel based on (1) his attorney's failure to move for a judgment of acquittal on the conspiracy count on the ground he was acquitted of the substantive count and (2) his failure to move to dismiss count two on the ground of multiplicity, are not barred by the statute of limitations, Cantu has failed to allege facts which, if true, would entitle him to any relief. To establish ineffective assistance of counsel a defendant "is required to establish both (1) constitutionally deficient performance by his counsel and (2) actual prejudice as a result of counsel's ineffectiveness." *Moody v. Johnson*, 139 F.3d 477, 482 (5th Cir. 1998) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984)). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

> As the Supreme Court has explained, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from the counsel's perspective at the time." Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound strategy."

*Knox v. Johnson*, 224 F.3d 470, 478 (2000) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2065).

-22-

With regard to prejudice, "the right to effective assistance of counsel, both at the trial and appellate level, is recognized not for its own sake, but because of the effect that it has on the ability of the accused to receive a fair trial." *Earhart v. Johnson*, 132 F.3d 1062, 1067-68 (5th Cir. 1998) (citations and internal quotations omitted). The second prong of the *Strickland* test focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838 (1993). "Even a deficient performance does not result in prejudice unless that conduct so undermined the proper functioning of the adversary process that the trial cannot be relied upon as having produced a just result." *Knox v. Johnson*, 224 F.3d at 478 (citing *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052). "[I]n cases involving mere attorney error, . . . [courts] require the defendant to demonstrate that the errors 'actually had an adverse effect on the defense. '" *Barrientes v. Johnson*, 221 F.3d 741, 754 (5th Cir. 2000) (citation and internal quotations omitted). "Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim." *Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997) (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064 (1984)).

Cantu contends that he was denied his right to effective assistance of counsel due to his attorney's failure to move for a judgment of acquittal on the conspiracy

count based on his acquittal on the substantive count. The Supreme Court has recognized, however, that RICO conspiracy is different from the substantive RICO offense in that there is no requirement that the defendant himself commit or agree to commit the two predicate acts requisite for a substantive RICO offense. *Salinas v. United States*, 522 U.S. 52, 61-66, 118 S.Ct. 469, 476-478 (1997). "It is settled law in this country that the commission of a substantive offense and a conspiracy to commit it are separate and distinct crimes, and a plea of double jeopardy is not defense to a conviction for both." *Pereira v. United States*, 347 U.S. 1, 11, 74 S.Ct. 358, 364 (1954). "[C]onspiracy to commit a crime and the crime itself are separate punishable offenses." *United States v. Goff*, 847 F.2d 149, 175 (5th Cir. 1988) (citation omitted). Counsel's performance was therefore not deficient in failing to move for an acquittal on the conspiracy offense based on the jury's acquittal of Cantu on the substantive offense.

For the same reason, there was no basis for challenging the indictment on the ground of multiplicity. *See United States v. Bright*, 630 F.2d 804, 813 (5th Cir. 1980) (government was not compelled to elect between count charging conspiracy to violate RICO and count charging aiding and abetting a violation of RICO); *United States v. Lewis,* 621 F.2d 1382, 1390 (5th Cir. 1980) ("A conspiracy charge under 21 U.S.C. § 841 is not multiplicitous when joined with substantive charges under 21 U.S.C. §

841(a)(1)."); *see also United States v. DeLeon*, 641 F.2d 330, 337 (5th Cir. 1981) ("Joinder of a conspiracy count and a substantive count arising out of that conspiracy is permitted under Fed. R. Crim. P. 8(b) because the claim of conspiracy provides a common link and demonstrates that the offenses grow out of the same acts or transactions for purposes of the federal rule."). Cantu has failed to allege facts which, if true, would support a finding of a Sixth Amendment violation.

## Conclusion

Based on the foregoing, the motion to vacate sentence pursuant to 28 U.S.C. §2255 should be denied.

Respectfully submitted,

MICHAEL T. SHELBY
United States Attorney

KATHLYN G. SNYDER
Assistant United States Attorney
910 Travis Street, Suite 1500
P. O. Box 61129
Houston, Texas 77208-1129
Texas Bar No. 07839300
Federal ID No. 14456

-26-

## CERTIFICATE OF SERVICE

I, Kathlyn G. Snyder, Assistant United States Attorney, do hereby certify that

a copy of the above Answer to Motion to Vacate under 28 U.S.C. §2255 and Brief has

been mailed on November 6, 2003 to:

      Roy Edward Cantu
      Reg. No. 05508-078
      FCC Beaumont Low
      P. O. Box 26020
      Beaumont, TX 77720

                  KATHLYN G. SNYDER
                  Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

UNITED STATES OF AMERICA,          §
    Respondent,                    §
                                   §
v.                                 §          CR. NO. B-98-75
                                   §          (Civil Action No. B-03-147)
ROY EDWARD CANTU,                   §
    Petitioner.                    §

## ORDER

Pending before this court is Petitioner's Motion to Vacate Sentence Pursuant

to 28 U.S.C. §2255. After having considered same, along with the response of the

United States, this court is of the view that relief should be denied for the reasons

stated in the United States' answer.

Signed this _____ day of _____, 2003.


_____
UNITED STATES DISTRICT JUDGE